UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

LEELANAU WINE CELLARS, LTD.,

        Plaintiff,

v.                                               Case No.  1:01-CV-319

BLACK & RED, INC., et al.,                 HON. GORDON J. QUIST

        Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.  Background and Procedural History

Plaintiff, Leelanau Wine Cellars, Ltd. ("LWC"), sued Defendant Black & Red, Inc. ("B &

R") and its principals, Joanne Smart ("Smart") and Roberta Kurtz ("Kurtz"),[1] alleging claims for

trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a),

common law unfair competition, violation of the Michigan Consumer Protection Act, M.C.L. §§

445.901 to .922, and an accounting.  Initially, the Court granted partial summary judgment to LWC

in an Opinion and Order dated August 13, 2002.  Subsequently, following a two-day bench trial on

August 28 and 29, 2002, the Court notified the parties via its November 21, 2002, Order about

concerns that it had regarding its prior ruling and requested input from the parties on various issues.

After receipt of the November 21, 2002, Order, LWC moved for additional time to  conduct and

present a consumer survey.  By Order dated December 20, 2002, the Court denied the motion,

concluding that LWC had ample time to obtain a consumer survey prior to the close of discovery.

_____

[1]Joanne Smart died on April 6, 2005.

In an Opinion and Order entered on February 14, 2003, the Court issued findings of fact and conclusions of law, vacated its August 13, 2002, Order and entered judgment in favor of Defendants. In its Opinion, the Court concluded, among other things, that LWC's mark is descriptive and therefore weak, especially because LWC failed to present any consumer survey or other direct evidence showing that consumers understand "Leelanau," when used in connection with wine, to refer to LWC. *See Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, No. 1:01-CV-319, 2003 WL 396340, at *6 (W.D. Mich. Feb. 14, 2003). LWC appealed the Court's February 14, 2003, Order to the United States Court of Appeals for the Sixth Circuit. The parties argued the case before the Sixth Circuit on January 28, 2004, and on December 29, 2004, the panel issued an unpublished opinion reversing and remanding the case to this Court. In particular, the Sixth Circuit affirmed this Court's conclusion that it had the authority to reconsider its August 13, 2002, Opinion and Order. It held, however, that this Court should have allowed LWC the opportunity to present consumer survey evidence in connection with the issues of secondary meaning and likelihood of confusion. Therefore, it remanded with instructions to consider LWC's consumer survey evidence in determining "whether there are genuine issues of material fact with respect to the likelihood of confusion between the two marks." *Leelanau Wine Cellars Ltd. v. Black & Red, Inc.*, 118 F. App'x 942, 949 (6th Cir. 2004). It also stated, however, that "[i]n addition to the consumer survey evidence, all evidence bearing on the eight-factor test in *Frisch's* may be introduced to the district court to determine whether there are genuine issues of material fact with respect to the likelihood of confusion between the two marks." *Id.* at 949.

Following the remand, the Court held a status conference at which LWC informed the Court that it planned to hire an expert to design and conduct a consumer survey. The Court gave LWC

several months to complete the survey and scheduled a bench trial for September 20, 2005.  In June or July 2005, LWC retained Dr. Sara Parikh as its expert to design and conduct a consumer survey to measure consumer confusion between LWC and Chateau de Leelanau.  Subsequently, the Court granted LWC additional time to complete its survey and moved the trial date.

On August 15, 2006, the Court held a bench trial on the issues of liability and damages.  Per the agreement of the parties, the Court received the evidence pertaining to the Parikh survey, including Defendants' expert's criticism, through the parties' previously-filed materials.  The Court also received, subject to Defendants' objections, additional evidence from LWC on the issue of actual confusion.  Having heard and received all of the evidence in this case regarding likelihood of confusion, the Court is now prepared to issue its decision following trial.  Because the Sixth Circuit did not disturb this Court's prior findings of fact and conclusions of law set forth in its February 14, 2003, Opinion, the Court will not retrace its steps from its prior findings and conclusions, but instead will determine whether the Parikh survey and the other evidence LWC presented at trial compels a different conclusion than that which the Court reached in its prior findings and conclusions.

## II. <u>Evidentiary Determinations</u>

Before reaching the merits, the Court must determine the admissibility of certain evidence, which includes: (1) the Parikh survey; (2) an e-mail dated July 22, 2003, from Dennis Schrapp to Robert Jacobson regarding Mr. Schrapp's confusion about Chateau de Leelanau being a separate company from LWC; (3) testimony by Robert Jacobson regarding questions and comments that he has received at wine tastings around the state with regard to whether Defendants' tasting room south of Suttons Bay was LWC's new tasting room; and (4) testimony by Robert Jacobson about an incident in which a representative from the Leland Business Association mistakenly believed that

LWC had signed up to participate in the Leland food and wine festival, when in fact, Defendants had

signed up to participate and LWC was not planning on participating in the event.[2]

## A.     The Parikh Survey

The admissibility of surveys is governed by Federal Rule of Evidence 702, which

incorporates the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579,

113 S. Ct. 2786 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999),

i.e., that expert testimony must be both relevant and reliable.  *See Wells Fargo & Co. v. WhenU.com,

Inc.*, 293 F. Supp. 734, 765 (E.D. Mich. 2003).  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts
> or data, (2) the testimony is the product of reliable principles and methods, and (3)
> the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

It is now commonly accepted that consumer surveys are admissible in trademark actions and

may provide strong evidence on issues of secondary meaning and likelihood of consumer confusion.

*See Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 298, 312 (6th Cir.

2001) ("'Because the determination of whether a mark has acquired secondary meaning is primarily

an empirical inquiry, survey evidence is the most direct and persuasive evidence.'") (quoting *Sugar

Busters LLC v. Brennan*, 177 F.3d 258, 269 (5th Cir. 1999)); *Ashland Oil, Inc. v. Olympco, Inc.*, No.

94-5520, 1995 WL 499466, at * (6th Cir. Aug. 21, 1995) (citing consumer surveys as among the

---

[2]Robert Jacobson also testified about an incident in which an LWC employee relayed to him a customer's story about confusing Defendants' tasting room in Suttons Bay with LWC's tasting room and the customer being upset because Defendants' employees did not clarify that they were not connected with LWC.  However, the Court sustained Defendants' objection to the testimony on hearsay grounds, and LWC's counsel concurred with the ruling.  Therefore, this evidence has already been excluded.

types of evidence that may be introduced to show that a mark has acquired secondary meaning); *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 225 (2d Cir. 1999) ("Surveys are . . . routinely admitted in trademark . . . cases to show actual confusion, genericness of a name or secondary meaning, all of which depend on establishing that certain associations have been drawn in the public mind."); *Simon Property Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033, 1038 (S.D. Ind. 2000) ("Consumer surveys are generally accepted by courts as one means of showing the likelihood of consumer confusion."). "The proponent of the survey bears the burden of establishing its admissibility." *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988).

> To be admissible, surveys should generally satisfy the following foundational requirements:
>
> (1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles, and (7) objectivity of the process was assured.

*Consumers Union of United States, Inc. v. New Regina Corp.*, 664 F. Supp. 753, 769 n.19 (S.D.N.Y. 1987) (citing *Toys R Us, Inc. v. Canarsie, Kiddie Shop, Inc.*, 559 F. Supp. 1189, 1205 (E.D.N.Y. 1983)). *See also Manual for Complex Litigation* (Fourth) § 11.493 (2004) (stating that relevant factors in assessing the admissibility of a survey are (1) the population was properly chosen and defined; (2) the sample chosen was representative of that population; (3) the data gathered were accurately reported; and (4) the data were analyzed in accordance with accepted statistical principles, and that in assessing the validity of a survey, a court should consider: (1) whether the questions asked were clear and not leading; (2) whether the survey was conducted by a qualified person using proper interview procedures; and (3) whether the survey was conducted so as to ensure objectivity).

Because almost all surveys are subject to some sort of criticism, courts generally hold that flaws in survey methodology go to the evidentiary weight of the survey rather than its admissibility. *See Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, (5th Cir. 2004) ("Usually, methodological flaws in a survey bear on the weight the survey should receive, not the survey's admissibility."); *Prudential Ins. Co. v. Gibralter Fin. Corp.*, 694 F.2d 1150, 1156 ("Technical unreliability goes to the weight accorded a survey, not its admissibility."); *Adjusters Int'l, Inc. v. Pub. Adjusters Int'l, Inc.*, No. 92-CV-1426, 1996 WL 492905, at *11 (N.D.N.Y. Aug. 27, 1996) ("Generally, statistical imperfections in the survey introduced by plaintiff go to the weight of the evidence rather than its admissibility.") "There are limits, however. The court need not and should not respond reflexively to every criticism by saying it merely 'goes to the weight' of the survey rather than to its admissibility. If the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial." *Simon Prop. Group*, 104 F. Supp. 2d at 1039; *accord Vista Food Exchange, Inc. v. Vistar Corp.*, No. 03-CV-52-3DRHWDW, 2005 WL 2371958, at *7 (E.D.N.Y. Sept. 27, 2005) (excluding the plaintiff's likelihood of confusion survey as "flawed to the point that its probative value is substantially outweighed by [its] potential for unfair prejudice and confusion").

LWC retained Dr. Sara Parikh to design and conduct a consumer survey "to measure the extent to which, if any, consumers who encounter wine bearing the Chateau de Leelanau name believe it to be the same as, or come from the same or a related source, as Leelanau Wine Cellars." (Parikh Decl. ¶ 4.) Dr. Parikh is a Vice-President of Leo J. Shapiro and Associates, a market research and consulting firm located in Chicago, Illinois.

Dr. Parikh designed the survey to use a "mall-intercept" model, where participants are selected for interviews at shopping malls using a systematic sampling process. Dr. Parikh hired the firm Survey Center, L.L.C. to conduct the interviews and administer and supervise the survey, under her direction. (*Id.* ¶ 13.)  The "double-blind" approach was used, meaning that neither the interviewers nor the participants were aware of the purpose of the research or the identity of the party that commissioned it. (*Id.* ¶ 14.)  Interviews were conducted between September 23 and October 12, 2005, at four malls in markets located throughout Michigan, including two in the metro Detroit area (Troy and Westland), one in Traverse City, and one in Grand Rapids.  Initially, participants were screened to ensure that they met the following criteria: (1) 21 years of age or older; (2) must have purchased a regular size bottle (750 ml) of wine that costs between $5 and $14 within the last three months or must be likely to make such a purchase within the next three months; (3) no household member working for a market research firm or an advertising firm, a manufacturer, distributor, or retailer of wine; a bar or restaurant that serves wine; or a store in the mall; (4) must not have participated in any market research survey in the past three months; and (5) must be wearing his/her eyeglasses or contacts if normally worn while shopping for wine. (*Id.* ¶ 6; Interviewing Instructions at 2.)

Participants were divided into two groups, a "test cell" and a "control cell." (Parikh Survey ¶ 5.)  The test cell consisted of 203 participants and the control cell consisted of 101 participants.  Both groups were first shown an advertisement for LWC Chardonnay wines. (*Id.* ¶ 7.)  After the participants finished looking at the advertisement, the interviewer put it away out of sight for the remainder of the interview. (*Id.* ¶ 8.)  Participants were then shown a display of five bottles of Chardonnay wines, all from different Michigan wineries. The following wines were present in both

7

the test cell display and the control cell display: Turner Road, St. Julian, Wilhurst, and Zafarana. The fifth bottle in the test cell was Chateau de Leelanau, while the fifth bottle in the control cell was Bel Lago, another winery, like LWC and Defendant Black & Red, located in the Leelanau Peninsula. (*Id.* ¶ 8.)  After the participants examined the bottles, they were asked the following question: "Do you believe there is <u>OR</u> is not a bottle of wine in this display that is the same as, or comes from the same source, that is, the same winery that puts out the wine in the advertisement that you just looked at?"  (*Id.* ¶ 10.)  Participants who answered "yes" were asked follow-up questions about their thinking.  Participants who answered "no" or "don't know" were asked another follow-up question: "And, do you believe there is <u>OR</u> is not a relationship, sponsorship, or association between the winery that puts out any of the bottles of wine in this display and the winery that puts out the bottle of wine in the advertisement you just looked at?"  (*Id.*)  Based upon the survey results, Dr. Parikh concluded:

> When the results are adjusted for survey "noise" or guessing, the net confusion level ranges between 27% and 31%.  This suggests that there is a significant likelihood of confusion in the marketplace such that a significant proportion of Michigan consumers who encounter the Chateau de Leelanau wine are likely to falsely believe it to be the same as, or come from the same source or a related source as Leelanau Wine Cellars.

(*Id.* ¶ 26.)

In their various briefs, Defendants cite several grounds for excluding Dr. Parikh's survey. They argue that the survey is inadmissible because: (1) the sample chosen was not likely to be representative of the chosen target population because it did not properly cover the target population; (2) the sample is a nonprobability (as opposed to a probability) sample and the results cannot be extrapolated to the target population by applying well-established statistical methods to calculate

unbiased estimates of population statistics and confidence levels; (3) Dr. Parikh did not analyze her data in accordance with accepted statistical principles; and (4) the survey questions were ambiguous and leading. Defendants support their criticism of the survey with an affidavit from their expert, Dr. Jeffery A. Stec. LWC counters that Dr. Parikh's survey is valid and admissible and that, even if there were any validity to Defendants' objections, they would go to the weight to be given to the survey rather than its admissibility. For example, citing the Federal Judicial Center *Reference Manual on Scientific Evidence, Reference Guide on Survey Research*, (2d ed. 2000), LWC notes that the majority of consumer surveys admitted into evidence in Lanham Act litigation are nonprobability surveys. LWC also notes that Defendants did not ask Dr. Stec to perform his own survey and, therefore, his criticisms of Dr. Parikh's survey methodology cannot be validated without the results of a competing survey. LWC posits that, without any alternate survey results, this Court cannot conclude that the results of Dr. Parikh's survey would have been any different had the alleged flaws been corrected, and, therefore, the Court should accord substantial weight to the survey results.

Initially, the Court makes two observations about the survey. First, Defendants do not take issue with Dr. Parikh's qualifications to design and conduct the survey and to analyze its results. Based upon its own review of Dr. Parikh's education and experience, the Court concludes that Dr. Parikh is qualified to design and conduct a consumer survey and to testify about its results in this case. Second, LWC does not argue or suggest that Dr. Parikh's survey was designed to address the issue of secondary meaning, but, rather, it concedes that the survey was designed only to test whether consumers are likely to believe that Chateau de Leelanau wine is the same as, or comes from the same source as, LWC's wine. Indeed, the survey provides no measure of secondary meaning because it, and, more specifically, the questions to participants, were not properly formulated to

measure secondary meaning.  *See* Vincent N. Palladino, *Surveying Secondary Meaning*, 84 Trademark Rep. 155, 162-67 (1994).

As for Defendants' objections, the Court concludes (and Defendants appear to concede in their briefs), that the particular objections go to the weight, rather than the admissibility, to be given to the survey.  However, the Court has its own concerns with flaws in the survey that undermine its probative value.  In particular, the Court notes that the survey may be irrelevant and/or unreliable because it: (1) failed to identify the relevant consumer universe or used a consumer universe that was substantially overbroad; (2) failed to replicate conditions as consumers would encounter them in the marketplace; and (3) was highly suggestive and leading.

In its February 14, 2003, Opinion, the Court noted that the evidence presented at trial showed that the parties marketed their wines through substantially different means, with LWC marketing its wines on more of a mass basis through retail stores and Defendants marketing their wines primarily through their tasting room at Suttons Bay, Michigan.  *See* 2003 WL 396340, at *9.  The evidence presented at the August 15, 2006, trial was consistent with this prior ruling.  Roberta Kurtz testified that approximately 85% percent of B & W's sales are retail sales from its tasting rooms in Suttons Bay and Frankenmuth and that approximately 15% of sales are wholesale.  In contrast, Robert Jacobson testified that about 25% of LWC's sales were at retail through its tasting rooms and that the remaining 70-75% of sales were at wholesale through mass marketers such as Meijer and Sam's Club.  While there was some evidence at the first trial that Defendants were attempting to expand their marketing efforts, there was no evidence either then or at the later trial of the extent to which they have done so (that is, nothing in the record shows that Defendants' and LWC's wines are sold or distributed through a common source), and there is no evidence that the parties' products are or

10

have ever been sold side-by-side in a retail store.  *See id.*  As the record thus stands, the only evidence is that the large majority of Defendants' wines are purchased from Defendants' tasting rooms.[3]

### 1.   The Universe Selected By Dr. Parikh Was Substantially Overbroad

Courts consider the selection of the proper universe as one of the most important factors in assessing the validity of a survey as well as the weight that it should receive.  *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980) (stating that "one of the most important factors in assessing the validity of an opinion poll is the adequacy of the 'survey universe,' that is the persons interviewed must adequately represent the opinions which are relevant to the litigation") (quoting *Am. Basketball Ass'n v. AMF Voit, Inc.*, 358 F. Supp. 981, 986 (S.D.N.Y. 1973), *aff'd* 487 F.2d 1393 (2d Cir. 1973)).  "Selection of a proper universe is so critical that 'even if the proper questions are asked, the results are likely to be irrelevant.'"  *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 767 (E.D. Mich. 2003) (quoting 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:159 (4th ed. 2003)).  In a trademark infringement case such as this, where the plaintiff alleges that the defendant's mark causes consumers of the defendant's products to mistakenly believe that the defendant's products are from the same source as, or are connected with, the plaintiff's products, the proper universe is the potential purchasers of the defendant's, i.e., the junior user's, products.  *See Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, No. 04-73923, 2006 WL 20523, at *6 (E.D. Mich. Jan. 4, 2006); *Franklin Res., Inc. v. Franklin Credit Mgm't Corp.*, No. 95 CIV. 7686(CSH), 1997 WL 543086, at *3 (S.D.N.Y. Sept. 4, 1997).

---

[3]The Court notes that consumers can also order wine through Defendants' website at www.chateaudeleelanau.com., but there is no evidence regarding the amount of sales through the website.

The proper universe in this case is the potential purchasers of Defendants' wine.  Dr. Parikh defined the universe as Michigan consumers over 21 years of age who had either purchased a bottle of wine in the $5 to $14 price range in the last three months or who expected to purchase a bottle of wine in that price range in the three months following the interview.  While this universe would certainly include purchasers of Defendants' wine, the problem is that the universe, as defined, is significantly overbroad.  That is, because Defendants' wines are available primarily only through their tasting rooms on the Leelanau Peninsula and in Frankenmuth and through their website, it is likely that only a tiny percentage of the consumers in the universe chosen by Dr. Parikh would be potential purchasers of Defendants' wines in connection with actual visits to Defendants' tasting rooms.  A survey participant who purchases wine only at grocery or discount retail store such as a Meijer or Sam's Club and who does not intend to visit and/or is unaware of Defendants' tasting rooms, or even of wineries in the Leelanau Peninsula, would not be a potential purchaser of Defendants' wine.

Courts have not hesitated to criticize surveys in similar cases where the proponent of the survey failed to employ screening criteria to ensure that the universe was limited to those who were potential purchasers of the defendant's product.  For example, in *Weight Watchers International, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259 (S.D.N.Y. 1990), the court found that the universe in a survey designed to show a likelihood of confusion between two diet frozen food manufacturers included respondents that were not likely purchasers.  The universe was defined as "women between the ages of 18 and 35 who have purchased frozen food entrees in the past six months and who have tried to lose weight through diet and/or exercise in the past year." *Id.* at 1272.  The court found that the universe should have been limited to consumers who had purchased a diet frozen entree or

individuals who had tried to lose weight through diet as opposed to exercise.  *See id.*  The court

observed that because the universe was not properly limited, it mistakenly included participants who

"may not have been in the market for diet food of any kind" and who "may well be less likely to be

aware of and to make relevant distinctions when reading ads than those who are potential

consumers."  *Id.* at 1272-73.  In another case, *Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 850 F.

Supp. 232 (S.D.N.Y. 1994), the distributor of Dom Perignon champagne sued the maker of a novelty

bottle of popcorn called Dom Popingnon for trademark infringement.  The plaintiff's likelihood of

confusion survey identified the universe as "persons between the legal drinking age and the age of

64."  *Id.* at 246.  The court found that the universe was too broad:

> The court can hardly believe that the mere fact that interviewees had reached the
> drinking age rendered them the equivalent of potential customers for DOM
> PERIGNON.  Rather, the better definition of the universe in this case would have
> been that group of consumers who were in the market for DOM PERIGNON, or at
> least for champagne.

*Id.*  Similarly, the court in *Franklin Resources, Inc. v. Franklin Credit Management Corp.*, No. 95

CIV.7686(CSH), 1997 WL 543086 (S.D.N.Y. Sept. 4, 1997), held that the plaintiff's expert failed

to properly screen participants to obtain the relevant universe of potential consumers of the

defendant's services.  The plaintiff was a financial services company in the business of providing

investment advice and related services, including administrative services for a group of mutual

funds.  The defendant was in the business of purchasing troubled loans from the Federal Deposit

Insurance Corporation, the Resolution Trust Corporation, and privately-owned banks.  The plaintiff's

survey used the universe of men and women over age 21 who reported that they were a head-of-

household or that they were employed full-time.  The court held that this universe was flawed

because there was no evidence that any of the survey respondents had either borrowed or saved or

intended to do so in the future and, even assuming that a large portion of the universe borrowed or saved at some point in their lives, there are many different ways to do so. *See id.* at *4. The court noted that "[t]he mere fact that a respondent has borrowed or saved, or intends to borrow or save, does not mean that that respondent is a potential customer for plaintiff's mutual funds or defendant's loan servicing." *Id.*

Dr. Parikh's survey is subject to the same criticisms as the surveys in *Weight Watchers*, *Scheiffelin*, and *Franklin Resources*. That is, the universe is overbroad because a purchaser of a $5 to $14 bottle of wine would, in most instances, be a potential consumer of Defendants' wine only if the purchaser planned to buy wine from Defendants' tasting rooms or website or, at the very least, through some winery's tasting room or website. *See Amstar Corp.*, 615 F. 2d at 264 ("As plaintiff's [Domino] sugar is sold primarily in grocery stores, participants in the Haley survey would have been repeatedly exposed to plaintiff's mark, but would have had little, if any, exposure to defendants' [Domino Pizza] mark. Furthermore, the survey neglected completely defendants' primary customers – young, single, male college students."). Moreover, because the universe that Dr. Parikh selected most likely included persons who are not potential consumers of Defendants' wine, Dr. Parikh necessarily failed to screen the participants to ensure that they would likely be aware of and make relevant distinctions concerning the specific product. *See Weight Watchers*, 744 F. Supp. at 1273. Accordingly, the Court must consider this flaw in determining whether the survey is admissible.

## 2.    The Survey Failed To Approximate Actual Market Conditions

"A survey that fails to adequately replicate market conditions is entitled to little weight, if any." *Wells Fargo & Co.*, 293 F. Supp. 2d at 766; *see also Simon Prop. Group*, 104 F. Supp. 2d at 1038 ("At bottom . . . , a survey to test likelihood of confusion must attempt to replicate the thought

14

processes of consumers encountering the disputed mark or marks as they would in the marketplace.).

On this issue, the Tenth Circuit has stated:

> The marks "must be compared in the light of what occurs in the marketplace, not in the courtroom." "A prospective purchaser does not ordinarily carry a sample or specimen of the article he knows well enough to call by its trade name, he necessarily depends upon the mental picture of that which symbolizes origin and ownership of the thing desired." Therefore, the court must determine whether the alleged infringing mark will be confusing to the public when singly presented.

*Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir. 1983) (citations omitted).

For example, in *General Motors Corp. v. Cadillac Marine & Boat Co.*, 226 F. Supp. 716 (W.D. Mich. 1964), the court observed that a purchaser's decision to buy a boat involves more than reviewing an advertisement or brochure:

> Actual purchasers of a boat would not hastily read an advertisement, nor would a potential purchaser read it carelessly. A reasonable man, anticipating the purchase of a boat, would peruse the material at least well enough to note the manufacturer as being "Cadillac Marine & Boat Company, 406 Seventh Street, Cadillac, Michigan." Also, most buyers would want to see the boat itself before making a purchase.

*Id.* at 737. In *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482 (10th Cir. 1987), the survey participants were handed a pair of the plaintiff's Jordache jeans and a pair of the defendant's Lardashe jeans and told to examine them, and then were asked whether they thought that the two pairs of jeans were made by the same manufacturer. The Tenth Circuit held that the district court did not err in according the survey little weight, because "[t]his type of 'side-by-side' comparison bears little resemblance to the actual workings of the marketplace." *Id.* at 1488; *see also Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1244 (9th Cir. 1984) (stating that even though the two marks were identical when viewed in isolation, their similarities had to be considered in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase of the

pens, including things such as the appearance of the pens, their packaging, and promotional materials).

The survey in this case was conducted in a manner that was substantially at odds with the circumstances under which most consumers encounter Defendants' wine.  As noted above, Defendants' wine is sold through Defendants' tasting rooms and website, which offer only one brand of wine – Chateau de Leelanau.  That is, actual purchasers would not be presented with the situation where Defendants' wine is displayed side-by-side with other wines, and they would be purchasing from a location identified expressly and exclusively with Chateau de Leelanau.  *See Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ. 7203(DLC), 2006 WL 1012939, at *25 (S.D.N.Y. Apr. 19, 2006) ("Most significantly, the survey did not replicate the marketplace conditions in which consumers encounter Lancome's products.  Lancome's cosmetics are sold at Lancome counters or department store sections, or over websites, with prominent signage identifying Lancome as the seller, and the products as Lancome products.").  Moreover, there is no indication that in the actual marketplace, purchasers of Chateau de Leelanau wine are ever exposed to LWC's advertising shortly before they  view or purchase Chateau de Leelanau wine.  Thus, the survey, in which participants were shown LWC's advertisement and then asked whether they believed that any of five wines, including one having the word "Leelanau" in its name, were the same as or came from the same source as the wine in the advertisement, was "little more than a memory test, testing the ability of the participants to remember the name[] of the [wine] they had just been shown." *Starter Corp. v. Converse, Inc.*, 170 F.2d 286, 297 (2d Cir. 1999).

### 3.    The Survey Was Suggestive And Leading

Generally, surveys which employ leading questions or are suggestive are of limited use in determining the likelihood of confusion.  *See* 5 McCarthy, *supra* at § 32:175 (stating that "it will

probably be improperly leading to suggest the desired response in the form of a yes or no question"). "A survey [] is not reliable if it suggests to the respondents an answer that would not have otherwise occurred to them." *Wells Fargo*, 293 F. Supp. 2d at 768.  In *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112 (2d Cir. 1984), the plaintiff's survey asked participants: "To the best of your knowledge, was the Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?"  The court found that the question was an obvious leading question that suggested its own answer, noting that "[t]he participants were presented with the Donkey Kong-King Kong connection rather than permitted to make their own associations."  *Id.* at 118.  The court also observed that "[w]hen the participants were asked 'As far as you know, who makes Donkey Kong?' not one suggested Universal or the makers of the King Kong movies."  *Id.* Similarly, in *Wuv's International, Inc. v. Loves Enterprises, Inc.*, 208 U.S.P.Q. 736 (D. Colo. 1980), the court found that the question, "What company or person do you believe owns or operates this restaurant?" was a valid question, but that the question "Do you believe that this restaurant is connected with or related to any other restaurants?" was suggestive.  *Id.* at 755.

In the present case, the entire survey was suggestive.  Participants were first shown LWC's advertisement and then asked whether they believed that any of the wines in the display, only one of which, Defendants' product, contained the word Leelanau on it, was the same as or came from the same winery as the winery that puts out the wine in the advertisement.  These circumstances not only suggested that participants should find a connection between the wine in the display and some other product, but specifically LWC's wine.  *See Powerhouse Marks*, 2006 WL 20523, at *6 (stating that the question "Which, if any, equipment brand that you see in this room do you believe is sponsored by, licensed by or associated with a particular fitness center, fitness club or fitness center chain" "clearly led respondents to find, not only a connection or association between the fitness

equipment shown and some other product or service, but specifically a fitness center, club or chain"). Of course, a much less suggestive format that would have provided a more reliable indication of likelihood of confusion would have been to simply show participants a bottle of Chateau de Leelanau wine and ask them what company they believed makes the wine.

### 4.      To Admit Or Not To Admit

Having identified what the Court considers to be substantial flaws in Dr. Parikh's survey, the Court is left to consider whether the flaws merely go to the weight of the evidence, or whether the flaws are so substantial that the survey is unreliable and/or irrelevant and should therefore be excluded.  While some courts have excluded surveys on the ground that they are so flawed that their evidentiary value is substantially outweighed by their potential for unfair prejudice and confusion, *see Vista Food Exchange, Inc. v. Vistar Corp.*, No. 03-CV-5203DRHWDW, 2005 WL 2371958, at *7 (E.D.N.Y. Sept. 27, 2005) (declining to admit a consumer survey which failed to identify the proper universe, used too small of a sample to be representative of potential consumers, did not replicate actual market conditions because it failed to show the defendant's mark as it was actually used in commerce, and failed to use a control product); *Simon Prop. Group*, 104 F. Supp. 2d at 1052 (denying the plaintiff's motion in limine for approval of its proposed likelihood of confusion surveys on the grounds that they did not did not bear any reasonable relation to situations in which consumers might actually encounter the marks in the marketplace, were highly suggestive and leading, and failed to include any form of control), other courts have concluded that questionable surveys should be admitted, with any flaws bearing upon the issue of weight.  *See Telemac Cellular Corp. v. Topp Telecom Inc.*, No. 98-CV-22, 1999 WL 33471891, at *21-22 (N.D. Cal. July 1, 1999) (concluding that in spite of serious questions regarding the survey methodology, the weight of the plaintiff's survey would be reserved for the trier of fact); *Franklin Resources*, 1997 WL 543086, at

*5-6 (concluding that the survey was "not devoid of all probative value . . . despite significant flaws in the survey's universe" and that the court would determine the weight to be given the survey at trial). While this is a close case, the Court concludes that the better course is to admit the survey and to consider any flaws in assigning weight in the likelihood of confusion analysis.

**B.** **The Schrapp E-mail and Other Incidents Of Confusion**

Defendants contend that the Schrapp e-mail is hearsay and therefore inadmissible. The Court disagrees. Courts have generally held that testimony regarding statements by customers evidencing confusion are admissible either because they are not hearsay or because they are admissible under Fed. R. Evid. 803(3) to show the declarant's state of mind, i.e., confusion between two trademarks. For example, in *Citizens Financial Group, Inc. v. Citizens National Bank*, 383 F.3d 110 (3d Cir. 2004), the Third Circuit held that the district court did not err in admitting testimony from the plaintiff-bank's tellers regarding their personal experiences with customers who expressed confusion between the plaintiff and the defendant because, it reasoned, such statements were not hearsay as defined by Federal Rule of Evidence 801(c). *See id.* at 133 ("In this case, the tellers described what they saw and the action they took with respect to customers who appeared to be confused with respect to CFG and CNBEC. This is not hearsay."). The court also noted that, to the extent that any of the statements could be deemed hearsay, they would nonetheless be admissible under Rule 803(3) to show the declarant's then-existing state of mind regarding confusion. *See id.* Other courts have reached similar conclusions. *See, e.g.*, *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1003-04 (2d Cir. 1997) (holding that testimony that some of the plaintiff's retail customers complained because they thought that the plaintiff was selling its toilet-shaped bank at a lower price to other retailers was not hearsay and was probative of the declarant's confusion); *Conversive, Inc. v. Conversagent, Inc.*, 433 F. Supp. 2d 1079, 1091 (holding that statements by the plaintiffs' sales

personnel regarding conversations that they had with potential customers were admissible to show then-existing state of mind regarding confusion).

Based upon the foregoing authority, as well as Defendants' failure to cite any persuasive authority to the contrary, the Court concludes that Robert Jacobson's testimony regarding his conversation with Mr. Schrapp, as well as Mr. Schrapp's e-mail, are admissible on the issue of actual confusion because Mr. Jacobson's testimony is not hearsay, and his testimony and the e-mail are admissible to show state of mind of the declarant. For the same reasons, the Court concludes that Robert Jacobson's testimony about questions and comments that he has received regarding Defendants' tasting room and his testimony about the misunderstanding with the Leland Business Association representative regarding the Leland food and wine festival is also admissible on the issue of actual confusion.

### III.  Discussion

The factors relevant to determining the issue of market confusion are: (1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care and sophistication; (7) the defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines using the marks. *See Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1984).

> Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case. But a thorough and analytical treatment must nevertheless be attempted. *The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.*

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) (quoting *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.* 931 F.2d 1100, 1104 (6th Cir. 1991)) (emphasis added).

20

### 1.    Strength of the Plaintiff's Mark

In its February 14, 2003, findings of fact and conclusions of law, the Court concluded that LWC's mark, being geographically descriptive, is weak. In doing so, the Court considered that: (1) LWC failed to present any consumer survey or other direct evidence showing that consumers understand "Leelanau," when used in connection with wine, to refer only to LWC; and (2) the designation of the "Leelanau Peninsula" as an American viticultural area for over twenty years made it just as likely that a consumer would understand a reference to wine as a "Leelanau wine" to mean that the wine originated from the Leelanau Peninsula instead of LWC. The Court also took into consideration the fact that LWC has used its mark for approximately 25 years as well as Michael Jacobson's statement in an affidavit that LWC has spent millions on the operation of its winery, but it noted that Mr. Jacobson's statement was insufficient to show substantial advertising efforts and it concluded that LWC's evidence was insufficient to show any particular degree of consumer recognition.

The Sixth Circuit remanded the case to this Court in order to allow LWC the opportunity to obtain and present a consumer survey on the issue of secondary meaning. As noted above, however, and as LWC acknowledges, the Parikh survey deals solely with the issue of likelihood of confusion and has no relevance regarding the issue of secondary meaning. The only additional evidence that the Court received at trial on the issue of secondary meaning was Michael Jacobson's testimony that LWC's advertising budget in recent years has been about $50,000. Apart from this evidence, LWC points to evidence that the Court received at the prior trial that its "Winter White" product is the single largest selling Michigan wine product and to an affidavit from William Schwab regarding his state of mind when consumers ask for "Leelanau Wines" or "wines from Leelanau." Finally, LWC contends that because its mark is registered on the Principal Register pursuant to Section 2(f), a

rebuttable presumption of secondary meaning arises, and Defendants have failed to offer any evidence to rebut the presumption.

The Court begins first with LWC's argument that the registration of its mark on the Principal Register entitles it to a presumption of secondary meaning which Defendants have not rebutted through evidence showing that LWC's mark does not have secondary meaning.[4]  LWC is correct that registration of a mark that is primarily geographically descriptive is accorded a presumption of secondary meaning.  *See* 15 U.S.C. § 1052(f); *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001) ("Once a mark is registered, the Act affords a plaintiff one of two presumptions: (1) that her registered trademark is not merely descriptive or generic; or (2) that if descriptive, the mark is accorded secondary meaning.") Thus, LWC's LEELANAU CELLARS trademark is entitled to a presumption of secondary meaning.  As the Court sees it, however, and as LWC appears to concede, (LWC's Trial Br. at 9-10, 12), the real issue in this case is whether relevant consumers understand that the use of the term "Leelanau" in connection with the sale of Michigan wine refers to LWC as the source of the wine rather than to the wine itself.  *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 465 U.S. 844, 851 n.11, 102 S. Ct. 2182, 2187 n.11, 102 S. Ct. 2182, 2187 n.11 (1982) (citing *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118, 59 S. Ct. 109, 115 (1938)).  Because "Leelanau" alone is solely geographically descriptive and is not LWC's registered mark, the presumption is not applicable because there is no basis to conclude that the United States Patent and Trademark Office determined that "Leelanau" alone had obtained secondary meaning in connection with LWC's use of LEELANAU CELLARS in its sales of wine.

---

[4]LWC cites *Wynn Oil Co. v. American Way Service Corp.* (*Wynn II*), 943 F.2d 595 (6th Cir. 1991), for the proposition that a mark that is descriptive and has secondary meaning is a "relatively strong" mark.  The Court is unable to find support for that proposition in *Wynn II*.  Rather, in that case, the Sixth Circuit reaffirmed its holding from *Wynn I*, 839 F.2d 1183 (6th Cir. 1988), that an incontestable mark is presumptively strong.  *See* 943 F.2d at 600.  Because LWC's mark was not registered for more than five years at the time it filed this lawsuit, its mark was not incontestable, and LWC does not suggest otherwise.

For the reasons set forth in the February 14, 2003, findings and conclusions, and for the additional reasons mentioned herein, the Court again concludes that LWC's mark is not a strong mark. LWC's evidence of secondary meaning is that it has used the term "Leelanau" in its brand name for over 25 years; that its "Winter White" product is the single largest selling Michigan wine product; that its advertising budget for the last several years has been about $50,000; and that LWC's sales increased from approximately 30,000 cases in 2001 to about 55,000 cases in 2005. While this constitutes some evidence of secondary meaning, it is not especially persuasive. For example, with regard to advertising expenditures, "there is no evidence to establish the amount as extensive or to distinguish it as beyond that necessary to survive in the market."[5] *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989). *See also McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1133 n.4 (2d Cir. 1979) (stating that "advertising and sales figures are open to varying interpretations"). LWC also relies upon the affidavit of William Schwab as direct evidence of secondary meaning. In its February 14, 2003, findings and conclusions, the Court stated that the Schwab affidavit was inadmissible and that his perception of what a customer means when he or she refers to "wines from Leelanau" is insufficient to demonstrate any degree of consumer recognition. Although the Sixth Circuit instructed this Court to consider all of LWC's evidence on remand, LWC did not call Mr. Schwab as a witness, nor did it request the Court to reconsider its prior determination that Mr. Schwab's testimony is inadmissible. Rather, in a footnote, LWC points out that Schwab's testimony on this point would not be hearsay, would be admissible, and would have shown in a relevant consumer's mind that the term "Leelanau" when used in regard to Michigan wine, means LWC. (Pl.'s Trial Br. at 10 n.7.) Regardless of what Mr.

---

[5]As a comparison, Roberta Kurtz testified that Defendants sold approximately 2000 cases of wine in 2004, while their total advertising expense was $21,028,71 for that year.

Schwab would have testified to, LWC failed to call him as a witness.  Moreover, while the Court agrees that his testimony would have been admissible to show his own state of mind, such testimony from a single retailer regarding his own perceptions would have carried much less weight than a consumer survey for purposes of determining how relevant *consumers* perceive the term Leelanau in connection with Michigan wine.  Thus, in the absence of reliable consumer survey evidence, and given that the term Leelanau is not only a geographical description, but, for over twenty years, has been part of an approved appellation of origin for wine, the Court concludes that LWC has failed to demonstrate that relevant consumers understand that the use of the term "Leelanau" in connection with the sale of Michigan wine refers only to LWC as the source of that wine.

### 2.    Relatedness of the Goods

In its prior findings and conclusions, the Court determined that the parties compete directly because LWC and Defendants sell the same product to the same consumers in the same geographical area.  While direct competition is present, it exists only to the extent that both parties sell their wines to customers from their separate tasting rooms.

### 3.    Similarity of the Marks

The Court concluded previously that Defendant's mark, CHATEAU DE LEELANAU, and LWC's LEELANAU CELLARS mark are not similar and that a consumer would not find Defendants' mark confusing when singly presented.  LWC argues that, pursuant to *Inducto-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358 (6th Cir. 1984), and *Eastern Wine Corp. v. Winslow-Warren, Ltd.*, 137 F.2d 955 (2d Cir. 1943), the descriptive terms "chateau" and "cellars" should be excluded from consideration of similarity of the marks, leaving only the identical term "Leelanau" for consideration.  In *Inducto-O-Matic*, the Sixth Circuit held that in comparing the similarity of the marks "INDUCTO" and "INDUCT-O-MATIC," the district court properly disregarded slight

24

differences in spelling, the use of hyphens, and other trivial distinctions, including the addition of "MATIC," which the court found to be "a weak and nondistinctive term," *id.* at 361, to the term "INDUCTO," which the court found was strong mark. *See id.* at 362.  While the Court agrees with LWC that the term "chateau" and "cellars" are descriptive and weak, the problem with applying *Inducto-O-Matic* in this case to exclude those terms is that the remaining term, "Leelanau," is not a strong and distinctive mark, such as "INDUCTO," but rather is a term that is geographically descriptive and, therefore, inherently weak.  The Court thus concludes that it followed the proper approach in its prior findings and conclusions in concluding that the marks are not similar.

### 4.    Evidence of Actual Confusion

The Court previously noted that there was no evidence of actual consumer confusion. Although LWC did present evidence of confusion relating to the "Wine Lab" incident, the Court declined to give that evidence any significant weight.  As noted above, LWC's evidence on remand focused primarily upon actual confusion, including the Parikh survey and anecdotal evidence of particular instances of confusion through Robert Jacobson's testimony.

The Court declines to give the Parikh survey any significant weight.  As noted above, the universe of respondents was overbroad and failed to focus upon respondents who were potential purchasers of Defendants' wine.  In addition, the survey was conducted in a  manner that was substantially at odds with the conditions that actual consumers would encounter in the marketplace. Finally, the survey questions were suggestive and leading.  Thus, from an overall perspective, the survey results are not very probative of actual consumer confusion.

Most of the other evidence is what the Court would characterize as non-consumer confusion evidence, including the Schrapp e-mail and the Leland food and wine festival incident.  While this evidence would not be probative of confusion at the point of sale, it is nonetheless admissible to

show "confusion of nonpurchasing, casual observers." *Champions Golf Club, Inc. v. Champions Golf Club, Inc.*, 78 F.3d 1111, 1119 (6th Cir. 1996) (internal quotations omitted).  Finally, Robert Jacobson's testimony regarding questions and comments about Defendants' tasting room from consumers at various wine tastings around the state is, of course, evidence of actual confusion.  This testimony, however, was vague and involved few details regarding specific incidents or even an estimate of the number of actual incidents.  In any event, even considering all of this evidence together, the Court concludes that it is, at best, *de minimis*.  *See Microware Sys. Corp. v. Apple Computer, Inc.*, 126 F. Supp. 2d 1207, 1216 (S.D. Iowa 2000).  As the Sixth Circuit has observed, "four incidents is not a considerable quantum of evidence of actual confusion, and minimal or isolated instances of actual confusion are, obviously, less probative than a showing of substantial actual confusion." *Champions Golf Club*, 78 F.3d at 1120.  Accordingly, while LWC's evidence of actual confusion deserves some weight, it does not amount to a significant showing of actual confusion.

### 5.        Marketing Channels Used

The Court's conclusion regarding this factor remains largely unchanged from that in its prior findings and conclusions.  The evidence presented at the August 15, 2006, trial affirmed that Defendants sell the vast majority of their wine from their tasting rooms, while LWC sells the majority of its wine through large-scale stores, such as Sam's Club and Meijer.  As noted above, there was evidence that Defendants sell some of their wine through channels other than their tasting rooms, but there was no evidence showing that this small percentage (15% or less) of Defendants' wine is sold through the same sources as LWC's wine.  However, the Court does note that there likely would be some overlap in customers with regard to tasting room traffic, because both parties rely on visitors to the Leelanau Peninsula for tasting room sales, and they both advertise to the same

customers through various regional newspapers and magazines and regional wine industry publications.

### 6.     Likely Degree of Purchaser Care

The Court previously concluded that this factor is entitled to little weight in the Court's analysis because, while there would be a low degree of purchaser care given the similarity of the products and their prices, most consumers currently purchase Defendants' wine from Defendants' tasting rooms rather than from a grocery store shelf, as would be the case with LWC's wine. However, assessment of purchaser care should include consideration of what actually occurs at a tasting room.  Unlike typical retail outlets, such as, for example, McDonalds, where customers usually order hamburgers and other food items without first sampling them and asking the cashiers about the type or origin of the ingredients, wine tasting room customers are usually invited to sample various wines before making a purchase, and there is usually a greater degree of interaction regarding topics such as the type of grapes used to make the wine, the origin of the grapes, and awards that the wine might have received.  Because of the depth of these exchanges, there would be a significant likelihood that any confusion about the origin of the parties' wines would be dispelled.

### 7.     Intent of Defendants

The Court has received no additional evidence that would cause it to reconsider or alter its prior conclusion on this factor.

### 8.     Expansion of Product Line

During trial, Roberta Kurtz told the Court that Defendants have the potential grape-growing capacity to expand in the future.  However, whether such expansion would occur is entirely speculative at this point.  Accordingly, the Court will assign this factor the same weight it gave it in its prior findings and conclusions.

### 9.    Evaluation of the Factors

In evaluating the factors, the Court finds it necessary only to consider whether the additional evidence that the Court received upon remand affects its prior conclusion that the relevant factors do not show that Defendants' wine is affiliated with LWC's wine.  As mentioned above, LWC's evidence on remand focused primarily upon actual confusion.  This evidence consisted of the Parikh survey and Michael Jacobson's testimony regarding some incidents of confusion.   While this evidence tends to support LWC's claim of likelihood of confusion, the Court concludes that its prior analysis – which gave substantial weight to its factual determinations that LWC's mark is relatively weak, that the "Leelanau Peninsula" is a long-established viticultural designation of wine, and that the marks are not confusingly similar – remains valid and is not undermined by LWC's relatively slight evidence of actual confusion.  Moreover, the Court adds that the fact that the large majority of Defendants' wine is sold through Defendants' tasting rooms, in an environment that tends to foster clarification, rather than confusion, about the source of Defendants' wine, substantially lessens the chance that confusion will occur.  Accordingly, based upon all of the evidence now before it, the Court concludes that LWC has failed to carry its burden of demonstrating that relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.

### IV.  Conclusion

For the foregoing reasons, the Court will enter judgment in favor of Defendants on all claims.

A Judgment consistent with these findings of fact and conclusions of law will be entered.


Dated:  September 7, 2006                        _____/s/ Gordon J. Quist_____
                                                          GORDON J. QUIST
                                                 UNITED STATES DISTRICT JUDGE